911 So.2d 1038 (2005)
Byron MABRY, Appellant
v.
TUNICA COUNTY SHERIFF'S DEPARTMENT and Mississippi Public Entity Workers' Compensation Trust, Appellee.
No. 2004-WC-01497-COA.
Court of Appeals of Mississippi.
September 27, 2005.
*1040 William Wayne Housley, Tupelo, attorney for appellant.
Fincher G. Bobo, attorney for appellee.
Before LEE, P.J., IRVING and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. The Workers' Compensation Commission affirmed the decision of an administrative law judge denying benefits to Byron Mabry. The Commission found that Mabry had failed to show that a disabling cerebral hemorrhage which he suffered at work was caused or contributed to by his employment. The Circuit Court of Tunica County affirmed the Commission's denial of benefits to Mabry. Mabry appeals, arguing that the Commission's decision was not supported by substantial evidence.
¶ 2. We find that substantial evidence supported the decision of the Commission and, therefore, we affirm the decision of the circuit court.

FACTS
¶ 3. On January 27, 2001, Mabry suffered a cerebral hemorrhage, or stroke, while performing his duties as a deputy sheriff for the Tunica County Sheriff's Department. On the day of the stroke, Mabry had been working for the Sheriffs' Department for approximately six months. He had worked for various employers in the fields of security and law enforcement for approximately ten years. At the time of the hearing, on October 15, 2002, Mabry was thirty-two years old.
¶ 4. In 1993, while working as a police officer for the City of Belmont Police Department, Mabry was involved in a high-speed chase and suffered a severe closed head injury when his head struck the roll cage in his patrol car. Mabry returned to work after that injury but, subsequently, developed hypertension that proved difficult to control with medication. Approximately three months prior to the cerebral hemorrhage, Mabry stopped taking any medication for hypertension. Mabry testified that he had planned to schedule blood work concerning his hypertension, but had not yet done so when the hemorrhage occurred.
¶ 5. Mabry testified that January 27, 2001 began as a normal day for him. In the morning, he communicated with friends on the Internet, performed household chores, and readied himself for work. He developed a headache, but thought it was due to a sinus infection and decided not to call in sick. He drove to the sheriff's department and then to Robinsonville to perform patrol duty. While driving, Mabry's headache increased significantly and he began experiencing split vision. He called the sheriff's department and arranged for another deputy to meet him at a nearby convenience store and take him home. When Mabry pulled into the convenience store's parking lot, he passed out, either inside his vehicle or once having exited the vehicle. His car bumped another car in the parking lot, but caused no damage.
¶ 6. Mabry was transported to Baptist Memorial Hospital where a CT scan was performed which showed a large right sided external capsule intracerebral hemorrhage. Dr. Winston Craig Clark performed a surgical evacuation of the blood clot caused by the hemorrhage. Mabry spent a week or two in intensive care and then went through months of physical rehabilitation. *1041 Mabry never returned to work after the stroke, but moved in with his parents. Mabry's mother testified that, since the stroke, Mabry has greatly diminished control over the left side of his body. He has no use of his left arm and is blind in his left eye. He must use a brace for his left leg and must walk with a cane. He cannot drive. His parents must assist him with dressing, eating, and bathing. His condition is expected to be permanent. Mabry receives social security disability. He stated that he loves law enforcement and that he misses his old job very much.
¶ 7. At the hearing, Mabry sought to establish that the stroke occurred because of work-related stress that exacerbated his hypertension. Mabry testified that, approximately five months before the stroke, he shot and killed a man in the line of duty. The man whom Mabry killed had robbed the Isle of Capri casino, and Mabry was called to the scene. After a car chase, the robber exited his car and pointed a gun at Mabry; Mabry shot him in self-defense. Mabry testified that he experienced anxiety after this incident and worried about it constantly. He stopped eating and had trouble sleeping. He was frightened by loud sounds, such as fireworks or a car backfiring. He became withdrawn and disliked leaving his house or socializing. Mabry stated that, the day of the hemorrhage, he "broke out in a cold sweat" when he put on his gun belt. Mabry also testified that stress was a part of his job as a deputy sheriff and that there was never a routine day on the job. He described several other incidents from his employment as a police officer or deputy in which he was threatened with a gun or thrust into a violent environment.
¶ 8. Dr. Jimmy Miller testified by deposition on behalf of Mabry. Dr. Miller thought that Mabry's cerebral hemorrhage was directly caused by his hypertension, but opined that Mabry's stress over having killed the robber could have exacerbated his hypertension, causing the hemorrhage. Dr. Miller stated that stress can cause an increase in blood pressure. Dr. Miller identified three possible scenarios concerning the cause of Mabry's stroke. In the first scenario, Mabry's high blood pressure itself caused the stroke and could have done so at any time. In the second scenario, Mabry's minor collision with the car in the convenience store parking lot scared him, resulting in elevated blood pressure that caused the stroke. In the third scenario, Dr. Miller explained, "[h]e shot this man; it was weighing on him. Every time he put on his uniform, he became more anxious. The radio goes off in his vehicle, he becomes more anxious. That could cause episodic elevation in blood pressure which contributed to the bleed." Dr. Miller testified that, to a reasonable degree of medical probability, Mabry's on-the-job stress at least contributed to his stroke.
¶ 9. Mabry's treating physician, Dr. Clark, stated in his deposition that Mabry's cerebral hemorrhage was caused by poorly controlled hypertension and could not be related to the stress of his employment to a reasonable degree of medical probability. An opinion letter written by Dr. Clark was read at the deposition and stated:
This was a large intracerebral bleed, and at the time of evaluation it was impossible to ascertain the exact bleeding site. Based on his difficult to control blood pressure, it was presumed at the time that this was directly related to elevated blood pressure; however, in terms of causation, it is difficult to know if the blood pressure elevation was due to factors directly associated with the performance of his duties as a deputy sheriff or if the elevated blood pressure was due to the increased pressure in his *1042 head from his blood clot. Unfortunately, I do not think there is going to be any way to solve this to a reasonable degree of probability.
¶ 10. Dr. Clark reaffirmed these opinions at the deposition. Dr. Clark thought that it would be hard to say that a hypertensive hemorrhage could be caused by any occupation. He stated that, while stress can elevate blood pressure, stress is not one of the three greatest risk factors for hypertension, which are genetic predisposition, associated medical problems such as diabetes, and tobacco and alcohol consumption. Dr. Clark stated that he wished to help Mabry if he could, "[b]ut, still, when you say under oath is there anything to a reasonable degree of medical certainty was his hypertension and, as a result, this hemorrhage the result of his job duty as a deputy sheriff, even the fact that he shot and killed somebody, probably not." Further, Dr. Clark rejected Dr. Miller's opinion that the hemorrhage could have been caused by Mabry's blood pressure having elevated when he bumped another car in the convenience store parking lot. Dr. Clark opined that it was merely possible, not probable, that Mabry's blood pressure became elevated from that incident and caused the hemorrhage.
¶ 11. The administrative law judge found that Mabry had failed to prove by the preponderance of the evidence that his disability was causally related to his employment. The administrative law judge based this finding upon the fact that Dr. Clark could not state to a reasonable degree of medical probability that Mabry's on-the-job stressors caused his cerebral hemorrhage. The administrative law judge gave more weight to the opinion of Dr. Clark than that of Dr. Miller because Dr. Clark was Mabry's treating physician, and because Dr. Miller admitted that he had never spoken with Mabry or met with him and had not reviewed all of Mabry's medical records.

STANDARD OF REVIEW
¶ 12. A decision of the Workers' Compensation Commission is subject to a limited standard of appellate review. Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 778(¶ 6) (Miss.2003). The Commission is the ultimate fact-finder, and this Court will reverse its decision only if it lacked the support of substantial evidence, was arbitrary and capricious, or contained an error of law. Id. When, as here, the Commission accepts the ALJ's findings and conclusions, we review those findings and conclusions as those of the Commission. McDowell v. Smith, 856 So.2d 581, 585(¶ 10) (Miss.Ct.App.2003). Additionally, "when examining conflicting opinions by medical experts, `we will not determine where the preponderance of the evidence lies ... the assumption being that the Commission as trier of fact, has previously determined which evidence is credible, has weight, and which is not.'" Hardaway Co. v. Bradley, 887 So.2d 793, 796(¶ 12) (Miss.2004) (quoting Baugh v. Cent. Miss. Planning & Development. Dist., 740 So.2d 342, 344(¶ 8) (Miss.Ct.App.1999)) (quoting Oswalt v. Abernathy & Clark, 625 So.2d 770, 772 (Miss.1993)).

LAW AND ANALYSIS

I. WHETHER THE ORDER OF THE COMMISSION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THAT MABRY FAILED TO SHOW HIS INJURY WAS CAUSALLY CONNECTED WITH HIS EMPLOYMENT.
¶ 13. In order to establish a prima facie case of disability, a claimant must show by a fair preponderance of the evidence (1) an accidental injury; (2) arising out of and in the course of employment; *1043 and (3) a causal connection between the injury and the claimed disability. Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 13 (Miss.1994). An injury arises out of the employment when there is some causal connection between the employment and the injury. Id. at 14. "Injury or death arises out of and in the course of employment even when the employment merely aggravates, accelerates, or contributes to the injury." Id. at 13 (quoting Chapman, Dependants of v. Hanson Scale Co., 495 So.2d 1357, 1360 (Miss.1986)). Thus, a claimant is entitled to benefits if the employment acts upon the claimant's pre-existing condition to produce disability. Id. Once a claimant establishes a prima facie case of disability, the burden of proof shifts to the employer. Id.
¶ 14. Relying on the opinions of Dr. Clark, the Commission found that Mabry had failed to show that his injury arose out of his employment with the sheriff's department. We find that the Commission's order was supported by substantial evidence. The sole proof of work-connected disability in this case consisted of the conflicting opinions of two medical experts. It is beyond peradventure that the Commission is entitled to weigh the conflicting, credible opinions of medical experts and that this Court may not interfere with this function by re-weighing the medical testimony. Hardaway, 887 So.2d at 796 (¶¶ 15-16). There is nothing in the record to suggest that the opinion of Dr. Clark was not credible evidence upon which the Commission was entitled to rely. See id. at 797(¶ 18). And, the Commission acted within its discretion in discounting Dr. Miller's testimony since Dr. Miller had not examined Mabry or even spoken with him, and had failed to review all of the pertinent medical records. "When an expert's opinion is based upon an inadequate or incomplete examination, that opinion does not carry as much weight and has little or no probative value when compared to the opinion of an expert that has made a thorough and adequate examination." Spann v. Wal-Mart Stores, 700 So.2d 308, 312(¶ 15) (Miss.1997) (quoting Johnson v. Ferguson, 435 So.2d 1191, 1195 (Miss. 1983)). Dr. Clark's testimony provided substantial support for the Commission's finding that Mabry had failed to show that his intracerebral hemorrhage was caused or contributed to by the stress he experienced as a deputy sheriff. The decision of the Commission was neither arbitrary nor capricious. Therefore, we affirm the decision of the circuit court.
¶ 15. THE JUDGMENT OF THE CIRCUIT COURT OF TUNICA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.